SMITH, J.
*488 Trever P., 12 years old at the time of the offenses, was found by the juvenile court to have committed acts of sexual molestation against his four-year-old cousin while babysitting him one day. The court committed Trever to the Division of Juvenile Justice (DJJ).
In this appeal, Trever argues that the primary evidence against him-an audio recording, surreptitiously made by the victim's mother, of the conversation Trever and the victim had during the offenses-was inadmissible. He says Penal Code section 632,[1] a part of the Invasion of Privacy Act, barred admission of the recording. We agree with the trial court's conclusion that the evidence was admissible under an exception in section 633.5. The exception allows *873 admission of a surreptitious recording if one party consents to being recorded for the purpose of obtaining evidence of certain specified crimes. The victim's mother reasonably suspected such a crime when she arranged to make the recording. She was not a party to the conversation, but, *489 as we will explain, section 633.5 is properly construed as allowing a parent to consent on behalf of a child under circumstances like these. In so holding, we adopt reasoning applied in several other jurisdictions.
The People contend that, in addition to this vicarious parental consent doctrine, the recording was admissible because the exclusionary provision of section 632 was abrogated by the provision of the California Constitution known as the truth in evidence rule ( Cal. Const., art. I, § 28, subd. (f)(2)), enacted by the voters as part of Proposition 8 in 1982. It is unnecessary to address this contention. We rely only on the parental consent analysis.
Trever also argues that the trial court abused its discretion by committing him to DJJ. In the unpublished portion of this opinion, we disagree. The judgment will be affirmed.
FACTS AND PROCEDURAL HISTORY
Kim was the mother of the victim, Ralph. Kim and Ralph lived with Kim's boyfriend in a trailer. On June 10, 2015, Trever came to the trailer to babysit Ralph alone while Kim and the boyfriend were at work. Ralph was happy and excited to see his cousin. When Trever returned the following day to babysit again, however, Ralph cried and said he did not want Kim to leave. Ralph said he was afraid Trever would leave him alone in the trailer. By that evening, Kim was worried that Trever could be verbally abusing Ralph, hitting him, or leaving him alone. She decided that the following day (June 12, 2015), before Trever came back, she would turn on her cell phone's recording function and conceal the phone in a cupboard, in the hope that the secret recording might show whether Trever was mistreating Ralph. Trever was with Ralph from 4:00 p.m. to 10:00 p.m. that day.
The recording, which we will describe in more detail below, included about two and a half hours of this period. On it, Trever's voice can be heard ordering Ralph to submit to numerous sex acts as Ralph says it hurts and tells Trever to stop.
Based on the events reflected in the recording, the district attorney filed a juvenile wardship petition alleging the following nine counts: (1) forcible sodomy against a victim under age 14 (§ 286, subd. (c)(2)(B)); (2) lewd act against a child (§ 288, subd. (a)); (3) forcible oral copulation (§ 288a, subd. (c)(2)(A)); (4) sexual penetration with a foreign object of a victim under age 14 (§ 289, subd. (a)(1)(B)); (5 through 7) three forcible lewd acts against a victim under age 14 (§ 288, subd. (b)(1)); (8) sodomy against a child under age 14 and seven or more years younger than the perpetrator *490 (§ 269, subd. (a)(3)); and (9) oral copulation of a child under age 14 and seven or more years younger than the perpetrator (§ 269, subd. (a)(4)).
Before the jurisdictional hearing, Trever filed a motion in limine to exclude the recording from evidence. He argued that the recording was made inadmissible by section 632 and asked the court to consider dismissing the petition because there was virtually no other evidence of the offenses. The People argued that the recording was admissible under the section 633.5 exception.
Section 632 makes it a criminal offense to use a device "to eavesdrop upon or record" a "confidential communication" without "the consent of all parties" to the communication. ( § 632, subd. (a).)
*874 Except to prove a violation of section 632 itself, evidence obtained in violation of the section "is not admissible in any judicial, administrative, legislative, or other proceeding." ( § 632, subd. (d).) Section 633.5 provides an exception according to which one party to a confidential communication is permitted to record the communication secretly "for the purpose of obtaining evidence reasonably believed to relate to the commission by any other party to the communication" of certain crimes, including "any felony involving violence against the person."
The court held a hearing on the motion. Kim testified and recounted the facts described above about her decision to make the surreptitious recording. On the first day of babysitting, before Kim went to work, Ralph was "excited and happy to see his cousin. There was no problem." On the second day, Ralph was "crying and telling me he didn't want me to go to work." He was "saying that [Trever] said he is going to leave me all alone." That night, Kim decided that the next day she would leave her "recorder on to see what [Trever] was doing. To see if [Trever] was leaving him inside and going outside and playing or if he was just being mean to him." Kim "didn't know what was going on." She said, "Something was going on, though." The prosecutor asked if Kim was "concerned if your son was being mistreated." Kim answered, "I was concerned that [Trever] was either verbally abusing him or maybe hitting him. That's it." She believed Trever might be hurting Ralph. On cross-examination, Kim said Ralph was "acting terrified" about being left with Trever, and Trever had been threatening to leave him alone. Ralph "had issues with" being left alone.
The juvenile court held another hearing at which it stated a tentative ruling that the recording was admissible under the section 633.5 exception. Acknowledging that no party to the conversation actually consented to the recording, the court accepted the People's invitation to embrace vicarious consent doctrine. Trever argued that Kim's testimony indicated that Ralph only said he was afraid Trever would leave him and Kim was only guessing when she thought Trever might be hitting Ralph At least implicitly, this *491 amounted to an argument that, in addition to the lack of consent by any party to the conversation, the evidence was also inadmissible because Kim did not have a reasonable belief that the recording would obtain evidence of a felony involving violence. The court, however, found that Kim had a sufficient basis to trigger the section 633.5 exception. The People also argued that the truth in evidence rule made the evidence admissible, but the court declined to decide that issue. At the end of the hearing, the court confirmed its tentative ruling.
At the jurisdictional hearing, the recording and a transcript were admitted into evidence. The transcript began with Ralph crying and expressing distress about Kim leaving for work. Kim's boyfriend started out trying to console Ralph, saying, "You're gonna be all right. You're supposed to miss her. That's a good thing.... She misses you too." But after a while he threatened to spank Ralph and finally said "I swear I will whip the shit out of you already." The boyfriend also told Ralph, "Trever's gonna be nice to you, because if not I'm gonna whoop his f****n' ass right in front of you and you can watch it, okay?"
After Kim and the boyfriend left, the following exchange occurred:
"[Trever]: ... Get up. (Unintelligible). Does that hurt?
*875 "[Ralph]: (No.)[2 ]
"[Trever]: Open up (your butthole). (Unintelligible). Come here. I'm gonna lay down. I want you to sit your butthole (unintelligible). Now ...
"[Ralph]: (Sit on here.)
"[Trever]: Yes, (do it). No, the other way (facing me).
"[Ralph]: This way?
"[Trever]: Yeah, sit down. No, (sit) like this. Put one leg over. Come here. Put one leg over me now (unintelligible). Wait-wait. Stand up. Here (unintelligible) (want you to stand right here and go like this. (Move your ass all the way over). Sit down (here now). Here, stand on the steps and do it. (Unintelligible). Come on. Do it right.
"[Ralph]: Like this?
*492 "[Trever]: No, like this. Look, all right (watch me). Bend over and open it up all the way grab (here, go like that), okay? Hold on. Does it hurt? Yeah?
"[Ralph] No. Ow, that hurts.
"[Trever]: Stop.
"[Ralph]: That hurts.
"[Trever]: Bend over now. Wait (unintelligible). Now (unintelligible). Hold on.
"[Ralph]: Ow.
"[Trever]: Stop. I just had it in there. Now ...
"[Ralph]: (No-now).
"[Trever]: Now, one more time-one more time-one more time.
"[Ralph]: (Owie).
"[Trever]: One more time.
"[Ralph]: I don't want to do (one that again).
"[Trever]: One more time. One more time and that's it, come on.
"[Ralph]: (Are you gonna hurt me?)
"[Trever]: I won't. Just do it. No, get on the first step like I told you to.
"[Ralph]: This step?
"[Trever]: Yes. And when I do-when I stick it in I want you to say ah-ah, okay?
"[Ralph]: Oh, that ...
"[Trever]: Stop.
"[Ralph]: That hurts-that hurts.
"[Trever]: Wait-wait, no.
*493 "[Ralph]: No.
"[Trever]: (I'm doing) it now. (It wasn't working). Now do it. Remember what I told you to say.
"[Ralph]: Ow, that hurts.
"[Trever]: Keep it-keep it now.
"[Ralph]: No, that hurts-that hurts.
"[Trever]: Now.
"[Ralph]: (You're hurting me).
"[Trever]: It's supposed to hurt."
The transcript contains many similar passages. Because the facts of the offenses are not in dispute, one more example will suffice to illustrate the nature of the conduct:
"[Trever]: One more time.
"[Ralph]: Please don't do it. (It hurts.)
"[Trever]: Stand up on the step now. I'm gonna stick it in you. Don't move. Don't even cry. If you cry, I'm never takin' you to see your mom again. Bend *876 over. No. Stand up and bend over. Okay, there you go. Now stop.
"[Ralph]: Ow.
"[Trever]: (Suck on it).
"[Ralph]: (Unintelligible).
"[Trever]: Now suck it. Suck it. Suck it now.
"[Ralph]: (Unintelligible).
"[Trever]: Suck it. You want-you want me to shove it in there again? Then suck it."
Trever told Ralph never to tell his mother what Trever did to him, and said Ralph would never see his mother again if he told her.
*494 Detective Joseph Henderson of the Merced Police Department testified that he contacted Trever to execute an arrest warrant. He read and explained Miranda[3] warnings to Trever. Henderson believed Trever understood the warnings. When Henderson asked whether Trever would give up his rights and be interviewed by Henderson, Trever said no. Henderson asked no more questions. Afterward, Trever rode to Merced with Henderson in a police car. They discussed a variety of subjects, including football and music. Henderson's impression was that Trever was intelligent, happy, and "reasonable to get along with."
The transcript of Kim's testimony at the hearing on the motion in limine was admitted into evidence at the jurisdictional hearing. The parties stipulated that a doctor examined Ralph and found no signs of trauma, but would testify that because of the passage of time, it would not be abnormal for any signs of trauma to have disappeared before the examination.
The court found by clear and convincing evidence that Trever knew the wrongfulness of the conduct and thus was capable of committing the crimes within the meaning of section 26, despite being below age 14. Turning to the offenses, the court found that Ralph was under age 14 and was very young, but that his exact age was not proved beyond a reasonable doubt,[4] so it was not established that Trever was seven or more years older than Ralph. The court found counts 8 and 9 not proven because they required proof that the victim was seven or more years younger than the perpetrator. It also found count 1 not proven because the recording did not make clear that the object with which Trever was penetrating Ralph's anus was Trever's penis, although it "probably" was. The court found the remaining counts true beyond a reasonable doubt.
Regarding the evidence, the court stated:
"I have to say this tape recording, Exhibit 2, is some of the most sickening evidence I've heard. I have presided over adult jury trials involving murders with gory evidence and sexual abuse cases with horrific testimony from the victims, but actually hearing the acts being committed, as is the case here, and Trever's callous and sadistic treatment of Ralph is very disturbing. He seems to take pleasure out of hurting Ralph, and threatening to leave him and spanking him. [¶] There are numerous instances of Trever telling Ralph to bend over and open his butt, that he was going to stick it in, and for Ralph to keep it in; and to do it just one more time, over and over; or requesting Ralph to 'suck it' and threaten[ing] to leave *877 him alone if he didn't and even threatening to kill him."
*495 In determining the maximum total confinement time, the court found each count was a separate occasion. "[T]here were breaks between the acts committed, and [Trever] did have time to reflect upon his actions." The court found the maximum time to be 52 years, calculated as follows: On count 2, two years; on count 3, eight years; on count 4, 12 years; on counts 5, 6 and 7, 10 years each.
Finally, the court ordered the case transferred from Merced County to Tulare County for the disposition hearing. It found that Trever's legal residence was in Tulare County, that his father and grandfather lived there, and that the transfer would be in his best interest.
At the conclusion of the disposition hearing, the Tulare County Juvenile Court committed Trever to DJJ. We will describe the evidence presented at the disposition hearing in our discussion below of Trever's challenge to the disposition.
DISCUSSION
I. Admissibility of surreptitious recording
Trever argues that the juvenile court erred when it denied his motion to exclude the surreptitious recording.[5] He renews the argument that section 632 applied; and the exception under section 633.5 did not apply, because Kim was not a party to the recorded communication. Courts in several jurisdictions, applying statutes similar to ours, have adhered to a rule that a parent can consent on behalf of her child under circumstances like these, despite the lack of a reference to vicarious parental consent in the statutes. As we will explain, we concur with the juvenile court in adopting this doctrine.
The underlying facts are not in dispute, and Trever does not now deny that Kim had objectively reasonable grounds for believing the recording would result in evidence of a felony involving violence. The question thus is only of the meaning of the consent the exception to section 632 found in section 633.5, a pure question of law, which we review de novo. ( *496 People v. Nazary (2010) 191 Cal.App.4th 727, 746-747, 120 Cal.Rptr.3d 143 [de novo review of application of section 632 where facts not in dispute], overruled on other grounds by People v. Vidana (2016) 1 Cal.5th 632, 648, fn. 16, 206 Cal.Rptr.3d 556, 377 P.3d 805.)
Our ultimate task in interpreting statutes is "to ascertain and effectuate legislative intent." ( People v. Woodhead (1987) 43 Cal.3d 1002, 1007, 239 Cal.Rptr. 656, 741 P.2d 154.) Where the language of a statute is clear, its plain meaning expresses the legislative intent and thus must be followed. "However, if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ( *878 Torres v. Parkhouse Tire Service, Inc. (2001) 26 Cal.4th 995, 1003, 111 Cal.Rptr.2d 564, 30 P.3d 57 ( Torres ).) When looking to the statutory scheme, we interpret particular provisions "so that the whole may be harmonized and retain effectiveness." ( Clean Air Constituency v. California State Air Resources Bd. (1974) 11 Cal.3d 801, 814, 114 Cal.Rptr. 577, 523 P.2d 617.) "In the end, we ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " ( Torres, supra, 26 Cal.4th at p. 1003, 111 Cal.Rptr.2d 564, 30 P.3d 57.)
There are several federal and out-of-state cases, considering the application of similar statutes under comparable circumstances, that are instructive.[6] As will be seen, the weight of the authority from these other jurisdictions heavily favors adoption of the vicarious consent doctrine.
The oldest of the cases adopting the doctrine is Thompson v. Dulaney (D. Utah 1993) 838 F.Supp. 1535 ( Thompson ). The United States District Court for the District of Utah ruled that the vicarious consent doctrine applied to the federal wiretap statute where, in the midst of divorce proceedings, a mother secretly recorded telephone conversations her three- and five-year-old sons had with the father, fearing the father was using telephone communications as an opportunity to interfere with her relationship with the children, of whom *497 she had been awarded custody.[7] ( Id. at pp. 1537, 1543-1544.) The federal statute is a one-party consent statute, unlike section 632, which requires consent of both parties. Section 633.5, however, is relevantly similar to the federal statute in that consent of one party under the specified conditions suffices to make the interception lawful.[8] The California and federal statutes also have in common a lack of any express reference to vicarious parental consent. In other words, the question in both instances is whether, where a child is one party to a communication, the statute should be construed as if it stated that a child's parent can validly consent to the surreptitious recording of the communication on the child's behalf, in situations where a party's consent would make the recording lawful.
In holding that the vicarious consent doctrine was applicable, the Thompson court reasoned that, under state law, the mother had both a right and an obligation to take, on the children's behalf, actions necessary for their protection. The existence of these parental powers and duties made necessary the application of the doctrine, *879 since there would otherwise be circumstances under which the wiretap law would obstruct their exercise. "[T]his case presents the paradigm example of why vicarious consent is necessary," the court stated. ( Thompson, supra , 838 F.Supp. at p. 1544.) The court emphasized that in reaching this conclusion, it was concerned with the fact that, at ages three and five, the children were both legally and actually incapable of giving consent themselves. ( Id. at p. 1543.) The court formulated the doctrine as follows:
"Thus, as long as the guardian has a good faith basis that is objectively reasonable for believing that it is necessary to consent on behalf of her minor children to the taping of the phone conversations, vicarious consent will be permissible in order for the guardian to fulfill her statutory mandate to act in the best interests of the children." ( Thompson, supra, 838 F.Supp. at p. 1544.)
The Sixth Circuit adopted Thompson in Pollock v. Pollock (6th Cir. 1998) 154 F.3d 601, 610 ( Pollock ). Quoting a federal appellate decision on a related issue (the application of an exception for situations where the recording was made from an extension phone inside the house), Pollock stated: " 'We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for that child's well-being.' " ( Id. at p. 610.) Noting the Thompson court's *498 emphasis on the young ages of the children there, the Pollock court nevertheless applied the doctrine to facts involving a 14-year-old child whose own view of the matter differed from that of the mother who surreptitiously recorded her conversations with her father and stepmother. ( Pollock, supra , at pp. 604-605, 608, 610.) "It would be problematic ... for [us] to attempt to limit the application of the doctrine to children of a certain age, as not all children develop emotionally and intellectually on the same timetable, and we decline to do so," the court stated. ( Id. at p. 610.)
Pollock appears to be the only federal appellate decision on the issue. Some district courts in the Eighth and Tenth Circuits have followed Thompson and Pollock . ( Babb v. Eagleton (N.D. Okla. 2007) 616 F.Supp.2d 1195, 1205-1206 ; Wagner v. Wagner (D. Minn. 1999) 64 F.Supp.2d 895, 899-901 ; Campbell v. Price (E.D. Ark. 1998) 2 F.Supp.2d 1186, 1189.) We have found no other federal cases deciding the issue, and thus none rejecting the doctrine.
Five state supreme courts have adopted the doctrine for purposes of state anti-interception statutes, in each instance finding a parent could consent vicariously despite the lack of an express parental consent provision in the statute. ( People v. Badalamenti (2016) 27 N.Y.3d 423, 54 N.E.3d 32, 37-40 ( Badalamenti ); Griffin v. Griffin (Me. 2014) 92 A.3d 1144, 1152 ; Commonwealth v. F.W. (2013) 465 Mass. 1, 986 N.E.2d 868, 873-875 [adopting doctrine and extending it to adult sibling of child victim]; State v. Whitner (2012) 399 S.C. 547, 732 S.E.2d 861, 864-865 ; State v. Spencer (Iowa 2007) 737 N.W.2d 124, 133-134 ( Spencer ).) Intermediate appellate courts in several other states have done the same. ( Lawrence v. Lawrence (Tenn. App. 2010) 360 S.W.3d 416, 418-420 ; Alameda v. State (Tex. Crim. App. 2007) 235 S.W.3d 218, 221-223 ; Smith v. Smith (La. App. 2005) 923 So.2d 732, 740 ; State v. Morrison (Ariz. App. 2002) 203 Ariz. 489, 56 P.3d 63, 65 ; In r e Marriage o f Radae (1991) 208 Ill.App.3d 1027, 153 Ill.Dec. 802, 567 N.E.2d 760, 763-764 ; State v. Diaz (N.J. App. 1998) 308 N.J.Super. 504, 706 A.2d 264, 269-270 ; Silas v. Silas (Ala. Civ. App. 1996) 680 So.2d 368, 370-372.)
The most recent of these state cases, the New York high court's decision in *880 Badalamenti , contains a thorough discussion. A father suspected his five-year-old son was being verbally and physically abused by the boyfriend who lived with the child's mother. One day, he tried to call the mother by cell phone. In a development that could only happen in the age of cell phones, his call went through, but apparently did so inadvertently, because no one on the other end spoke to the father. He simply heard what was happening in the mother's apartment. The mother and her boyfriend were yelling at the child and threatening to beat and punch him. The father tried using another cell phone to call the land line in the apartment, but no one answered. Then he *499 decided to use a recording function on one of the cell phones to record the conversation he was hearing. The boyfriend continued threatening to hit the child and made reference to a previous beating. ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at pp. 34-35.) Months later, the mother's landlady heard an altercation and called the police, leading to the boyfriend's prosecution for assault and child endangerment. ( Id. 34 N.Y.S.3d 360, 54 N.E.3d 32 at p. 35.) At trial, the father's recording was used as evidence against the boyfriend, who was convicted. ( Id. 34 N.Y.S.3d 360, 54 N.E.3d at pp. 35-36.)
The recording the father made fell within a state statute against eavesdropping, which required consent of at least one party to the overheard conversation. ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at p. 37.) The New York Court of Appeals agreed with the trial court, however, in adopting the vicarious consent doctrine and ruling that the father's consent satisfied the one-party consent requirement, even though he was not a party to the conversation he recorded. ( Id. 34 N.Y.S.3d 360, 54 N.E.3d at p. 38.) After reviewing the prior case law, the court stated:
"There is no basis in legislative history or precedent for concluding that the New York Legislature intended to subject a parent or guardian to criminal penalties for the act of recording his or her minor child's conversation out of a genuine concern for the child's best interests. By contrast, the vicarious consent doctrine recognizes the long-established principle that the law protects the right of a parent or guardian to take actions he or she considers to be in his or her child's best interests. Yet it also recognizes important constraints on that right, by requiring that the parent or guardian believe in good faith that it is necessary for the best interests of the child to make the recording, and that this belief be objectively reasonable." ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at pp. 39-40.)
Referring to a discussion in Dinger, supra , 28 Seattle University Law Review at page 989, the court also addressed several potential criticisms of the doctrine. ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at p. 40.) First, it could be argued that the doctrine could be misused by scheming parents involved in divorce proceedings. The court stated that a parent acting in bad faith and without an objectively reasonable belief that the recording was necessary for the child's best interest would not be found in trial proceedings to fall within the doctrine. ( Ibid. ) Second, it might be thought that the doctrine would allow parents to invade their children's privacy, since even when parents have a good faith, objectively reasonable belief in the need to intercept communications in a child's best interest, the intercepted communications might often extend to matters unrelated to that need. The New York court acknowledged that this was a legitimate concern, but concluded that genuine needs to protect childrens' interests outweighed *881 it. The court also observed that in legal proceedings, irrelevant material would properly be redacted and excluded from evidence. ( Id. 34 N.Y.S.3d 360, 54 N.E.3d at p. 41.) *500 The third counterargument was that, at least for older children, substitution of a parent's consent for a child's lack thereof might be thought to be an unacceptable infringement on the child's autonomy. The court's view was that this notion lacked merit because in the eyes of the law, unemancipated minors lack the sort of autonomy at issue. At the same time, the court believed the age and maturity of the child should be factors in a trial court's determination of whether there is a good faith, objectively reasonable belief in the need to intercept communications for the sake of the child's best interest. In other words, the best interests of older, more mature minors might less often be served by surreptitious interception of their communications by their parents. Trial courts' appropriate consideration of this factor would serve to mitigate the impact of the doctrine on older children's autonomy. ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at p. 41.)
Fourth, a critic of the doctrine might contend that it would lead to discord and resentment within families, when children learn their parents have secretly recorded their communications. The New York high court concluded that this possibility was an acceptable cost of the doctrine, justified by its benefits, and also that it can be reduced by trial courts' efforts to exclude irrelevant matter from evidence. ( Badalamenti, supra , 34 N.Y.S.3d 360, 54 N.E.3d at p. 41.)
We have found no state supreme court decisions rejecting the doctrine. One, West Virginia Dept. of Health and Human Resources ex rel . v. David L. (1994) 192 W.Va. 663, 453 S.E.2d 646, referred approvingly to Thompson , but held that the doctrine nevertheless did not apply under the circumstances of the case because the recording was made by the noncustodial parent using equipment that had been surreptitiously placed inside the custodial parent's home. ( West Virginia Dept. of Health and Human Resources ex rel . v. David L., supra, at p. 654.)
We have found one intermediate state appellate court decision rejecting the doctrine. In Williams v. Williams (1998) 229 Mich.App. 318, 581 N.W.2d 777, an ex-wife sued her ex-husband, alleging he violated the federal wiretapping law and a state eavesdropping law by surreptitiously recording telephone conversations between him and their five-year-old son. ( Id. at p. 778.) The trial court granted summary disposition to the father on these claims, concluding that as the custodial parent, the father could consent vicariously on behalf of the son where it was in the son's best interest to do so. ( Ibid. ) The appellate court reversed. Acknowledging the contrary results reached in Thompson and Pollock , ( Williams v. Williams, supra, at p. 781 & fn. 3 ) the court nevertheless believed that because both the state and federal statutes were silent on the question of whether consent included vicarious parental consent for minors, recognition of the doctrine would constitute an improper enlargement of the statutes' consent provisions.
*501 ( Id. at pp. 779-780.) The court stated that it must presume the legislators intended only the meaning they "plainly expressed" ( id. at p. 779 ) and could not "speculate with regard to the probable intent" beyond the "words expressed in the statute" ( id . at p. 780 ). The court also believed acceptance of the doctrine was "likely to have widespread implications and may encompass surreptitious actions by parents with less than laudable motives." ( Id. at p. 781.) Finally, the court suggested that parents involved in custody disputes *882 and needing to take actions in the best interests of their children could obtain authority via court order. ( Ibid. )
We agree with the reasoning in the cases adopting the vicarious consent doctrine and we think it applies to the one-party consent exception in section 633.5. The key to the analysis is that the Legislature could not have intended to deem a parent a criminal for eavesdropping on his or her child's conversation under conditions like these-and if the conduct is not unlawful under the statute, the statute's exclusionary provision is not triggered. Rejecting the doctrine would lead to a consequence that is absurd and exceedingly unlikely to have been intended by the Legislature.
Our statutes are unlike any of those considered in the prior case law on this topic in that they countenance eavesdropping with a single party's consent only "for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of" listed crimes. (§ 633.5.) As applied to our law, therefore, the vicarious consent doctrine states that section 632 does not prohibit a parent from recording a confidential communication to which his or her minor child is a party if (a) the purpose of the recording is to obtain evidence reasonably believed to relate to the commission by another party to the communication of a crime enumerated in section 633.5; and (b) the parent has a good faith, objectively reasonable belief that the recording is in the best interest of the child.
It might be argued that the exception should be extended to other situations as well. For instance, suppose a parent has two children, sibling A and sibling B, and has a reasonable belief that recording a conversation between sibling A and a third party would produce evidence of an enumerated crime and would be in the best interest of sibling B, who is, let us imagine, a potential victim. Because of situations like this, would it be better to embrace a broader exception than the one we recognize here? Since this case does not present such a situation, it would be inappropriate to express any opinion either way.
Another question is how the doctrine should be applied in cases in which the child is old enough to have, in a meaningful way, his or her own opinion regarding the surreptitious recording of a confidential conversation. Should *502 the vicarious consent doctrine be held not to apply when a 17-year-old wants the confidential communication to be kept secret from his or her parent? We agree with the approach of the New York Court of Appeals on this point: The doctrine remains applicable, but the facts about the minor's age and maturity may be relevant to the question of whether an objectively reasonable basis exists for finding the recording to be in the minor's best interest. It also seems to us that this type of concern will likely be less acute under our statutes, since the presence of a reasonable basis for believing the recording will produce evidence of a crime will often drive the determination of whether the recording is reasonably believed to be in the child's best interest (and the absence of such a basis will render the exception unavailable and thus will moot out the child's-best-interest question).
Trever argues that we should not employ the vicarious consent doctrine simply because it is not contained in the statute, suggesting that the language of the statute is clear and its plain meaning constrains us not to adopt the doctrine. In our view, the statutory language is not clear. The reasoning of the Iowa Supreme Court in Spencer , supra , 737 N.W.2d 124, is of assistance here. That court explained that the problem under examination was not *883 whether to create a new exception to the state's anti-interception statute, but to determine the meaning of the one-party consent exception within that statute. The ability of children to consent is often limited as a matter of law, in addition to being often factually absent, as in the case of children too young to comprehend the significance of consenting to the matter at hand. At the same time, the law often vests in parents or guardians a power to consent on behalf of children. The Iowa court's view was that, in light of this background, the term "consent" in the Iowa anti-interception statute was ambiguous, being reasonably subject to interpretations according to which parents did and did not have a role in granting consent to intercept their children's communications surreptitiously. This ambiguity rendered it necessary to find the intent of the legislature by reference to extra-textual considerations, including the policy in favor of adopting a reasonable interpretation that avoids absurd results and best achieves the statute's purpose. ( Id. at pp. 128-130.)
We are in the same situation. Our law states that both parties' consent is required in general ( § 632 ) and that one party's consent is sufficient under the exception (§ 633.5), but does not make clear what this means when the parties to the communication are children.[9] Children in California may be legally incompetent to give, or factually incapable of giving, their consent in various situations, and even when they could consent, the law might still *503 empower their parents to consent on their behalf. What, then, does consent mean for children in the context of these statutes? Our answer, which is only a partial answer sufficient to resolve the case before us, is as stated above: The requirements of the consent exception can be satisfied when a parent gives consent on behalf of a minor child based on an objectively reasonable belief that the recording will produce evidence of an enumerated crime and that the recording is in best interest of child.
The People argue that, in addition to or as an alternative to adopting the vicarious consent doctrine, we should hold that the exclusionary provision of section 632 was abrogated by the truth-in-evidence rule, as we have mentioned. Our holding makes it unnecessary to address this contention.
II. DJJ commitment**
DISPOSITION
The judgment is affirmed.
WE CONCUR:
POOCHIGIAN, Acting P.J.
FRANSON, J.

Subsequent statutory references are to the Penal Code unless otherwise noted.

Some words are shown in the transcript in parentheses. The transcript does not explain the significance of the parentheses.

Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Statements that Ralph was four years old are found in the probation report and the report of the psychological evaluator.

Trever frames his argument as a challenge to the sufficiency of the evidence that he committed the offenses, saying the evidence would have been insufficient if the recording had been excluded. He does this, perhaps, in the hope that if we reversed on this basis he could not be retried. As the People point out, however, his argument is really only a challenge to the admissibility of the evidence, for he does not claim the evidence actually presented, including the recording, was insufficient. Retrial is permitted in the case of a reversal resulting in exclusion of the evidence presented at trial because the prosecution, relying on the trial court's evidentiary ruling, might have decided to omit other evidence it could have used. (People v. Harvey (1984) 163 Cal.App.3d 90, 107-108, 208 Cal.Rptr. 910.)

The issue also has generated at least two law review pieces. (Dinger, Should Parents Be Allowed to Record a Child's Telephone Conversations When They Believe the Child Is in Danger? An Examination of the Federal Wiretap Statute and the Doctrine of Vicarious Consent in the Context of a Criminal Prosecution (2005) 28 Seattle U. L. Rev. 955 [arguing in favor of vicarious consent doctrine]; Bogosavljevic, Can Parents Vicariously Consent to Recording a Telephone Conversation on Behalf of a Minor Child? An Examination of the Vicarious Consent Exception under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (2000) 2000 U. Ill. L. Rev. 321 [arguing against].)

The federal statute makes it unlawful intentionally to "intercept" any "wire, oral, or electronic communication." (18 U.S.C. § 2511(1)(a).) Among other exceptions, it is not unlawful to intercept a communication under this statute if "a party to the communication" consents. (18 U.S.C. § 2511(2)(d).)

Specifically, the interception becomes lawful under the federal statute any time a party to the communication consents, while under section 633.5, a single party's consent makes the eavesdropping lawful provided it is for the purpose of obtaining evidence reasonably believed to relate to the commission by another party of certain offenses.

Section 633.5 does not actually contain the word "consent," but section 632 does, and the reference to section 632 in section 633.5 has the same effect as a provision stating in so many words that a single party's consent suffices to trigger the exception.

See footnote *, ante.